22, 1172, 23, 6348, 23, 6505, United States v. Davis, Goudelak, and Hunter. Good morning, your honors. My name is Jillian Harrington, and I represent defendant appellant Shamar Davis on this direct appeal. I did not represent Mr. Davis in the trial court below. As your honors are, of course, aware, we raised three issues in this case. The first is about the sufficiency of the evidence, which is where I'd like to begin today. And the second issue is about the sentencing enhancement that was added to Mr. Davis' guidelines regarding the stash house enhancement, the two-level enhancement. Now, Mr. Davis, of course, was convicted of two charges in this case. Did you just preview? You said you're going to raise three issues? Oh, yeah. We raised three issues. Those were the ones I was going to start with. And you're just going to talk about the first two? Great. Yes. Great. Yes. Yeah. The third issue is about the expert. Perfect. I'm kind of limited on time, so I figured I would jump right in. But thank you, your honor. Of course, he was convicted of two counts, the first count being the conspiracy, and the second count being the attempted possession with intent to distribute the cocaine that was seized from a tractor trailer, 10 kilos of cocaine. Starting with count one, a review of this record reveals that although there clearly was some narcotics conspiracy going on, the evidence presented by the government was insufficient to establish that Mr. Davis had knowledge of what was going on and that he agreed to join this conspiracy, because it relies primarily on, well, A, the testimony of these two cooperators. And the most important part of this claim is this trip that he took to Cleveland, Ohio, with his cousin. And they met up with these two drug traffickers, who ended up being the cooperators in this case, and they had dinner. But there's no testimony that Mr. Davis participated in the conversation, either during this dinner or on the car ride, about the drugs. In fact, one of them, I believe, testified something to the effect of, in sum and substance, he seemed to be along for the ride. So that evidence just isn't enough to get over the hump of proving that he agreed to join this conspiracy. And then, of course, after this dinner, they traveled back to Buffalo, where they're from, and they bring these two cooperators back with them, Pavia and Valdez. And before they leave, they get this tire that supposedly has 10 kilos of cocaine in it, and there's no evidence whatsoever that Mr. Davis knew what was in that tire. In fact, the whole story is kind of odd, that somebody left a tire on the side on the street with 10 kilos of cocaine in it, and then it was put into this woman's car. And the government calls it a hunt for the tire, but there's no evidence whatsoever that Mr. Davis knew that they were on a hunt, or what they were on a hunt for. Since time is short, I wonder if you could address the Stash House enhancement, please. Sure. And I wonder why it isn't relevant conduct. This was jointly undertaken, he was aware of how the property was being used. And why isn't the activity of his co-conspirator relevant to his own knowledge and control of the premises? Of course. So first of all, it's kind of connected to the first part, right? Because if we find that he wasn't part of this conspiracy, then there is no second part for this. So that's the first part. But just right, assuming that your honors affirm that part. The reason is basically in the wording of the statute, I'm sorry, the enhancement. The sentencing guidelines are very specific, that they say the defendant. I can look to the exact wording. I'm sorry, I'm just looking for- But it's not precluded. It says, okay, it applies to the defendant who knowingly maintains a premise. Now, of course, there is a part of the sentencing commission has set forth in another section that you can be held responsible. But the difference is, is that it was specifically worded that way. And there are two other subsections, which I referred to in my brief, where the commission wrote, if the defen- and this is all part of the same enhancement. And it says, if the defendant or a person for whose conduct the defendant is accountable. Or there's another part where it says, a person for whose conduct the defendant is accountable under 1B1.3. So it seems clear that the sentencing commission intentionally made this a defendant-based enhancement and not an offense-based enhancement. If they had intended it to be such, they could have drafted it to say, the defendant or anybody else whose conduct the defendant is responsible for. So your argument is that that specific language takes precedence over sort of the general conspiracy theory of bringing everyone under the enhancement? Yeah, I mean, there is the other enhancement that does create that responsibility. And brings you under other enhancements. But in this enhancement, it just seems like, like I said, the sentencing commission could very easily have worded it as such. But is there anything in the text that explicitly precludes it? You focus on the defendant maintained, but then the relevant conduct language is broad. And it says, unless otherwise specified, it's really far reaching, I guess, and malleable. Is there a particular reason why we should interpret this narrowly to really require the defendant alone maintained it? Well, because I think it's the court's responsibility and all of our responsibility to interpret it the way it was written, to give the sentencing guidelines and these specific enhancements. And then using the commentary to really, to go with what the intent of the commission was in drafting it this way. And the only way to know their intent is to look at their words and the words that they use. And they could have drafted it that way. And they elected not to, within the same enhancement. And what does the word maintain mean? And the defendant maintained a stash house, in your view. Well, he clearly doesn't fall under the traditional maintain, which would be to, and I don't have the definition in front of me. I know it's in my brief, I apologize. I don't know it off the top of my head. But even the district court, in giving the enhancement, discussed that this would have to be under a theory of joint responsibility. He didn't have a key, he didn't do the renting of it, he didn't pay the bills. It's really based on his participation in the conspiracy, and so it's the joint responsibility for it. But there's no evidence, absolutely none, that he was in any way responsible. The only evidence is that he was present there on a couple of occasions, which of course, as we discussed in the other point, how often he was there is definitely up for dispute. But he had no control over the premise. If your honors have no further questions, I know I'm way over on my time. You reserved a minute for a vote. I did, thank you. Mr. Anderson. Good morning, your honors. May it please the court. I'm Lucas Anderson, here for Adrian Goodluck. I want to first address Judge Carney's question. There is commentary in Section 2D1.1 that specifically says what you're supposed to consider in determining whether a defendant knowingly maintained a premises. If relevant conduct applies to everything under Chapter 2 or under Section 2D1.1, that's entirely academic. So is this court's recent discussion of the issue in the esteris case. And we discussed that and many other factors in our reply brief relating to the form of 2D1.1 also. There's all these provisions that say if something happens, then using the passive voice, then everybody who's involved in the conspiracy can be held responsible. So when there's all these provisions that say the defendant, the defendant, and there's provisions that don't say the defendant, we look to the absence of language and neighboring statutes as a relevant factor to consider. But I would prefer to begin now with our challenge to the district court's Batson ruling. Yeah, can I ask you a very preliminary question? Yes. I'm not sure if it's correct. And I tried to look through the trial record. This is a challenge, well, primarily right to the, I'm thinking of the challenge to the alternates, right? There were some challenges to the alternate jurors that you raised, right? There was one challenge to an alternate and one challenge to one who would not have been an alternate. Right. So the one for the alternates, did any of them, were any alternates seated on the 12-person jury? In other words, were jurors excused during trial and were some of the alternates elevated to actual juror status? Not that I recall. And as we discussed in our reply briefs, the fact that this juror 142, if she had been sat, if she hadn't been challenged, would have been an alternate juror, is not really relevant to the question of whether it's a reversible error under Batson. Because the Supreme Court has made clear that the Batson violation is a structural error. It's not just something that affects- Right, but my question is, that structural error, if you have somebody on the jury, if you keep somebody off the jury, because we can't look back retrospectively and say, hey, if there were a different person on the jury, they would have decided things differently because of their race or their gender or whatever, right? We can't hypothesize that a different juror would have decided something a different way, right? So that's why we can't engage in a harmless error analysis, it just doesn't work, so you would look at it structurally. The other thing is that a dependent has a right to have a jury that's a fair cross section of the community, right? Correct. And if you don't have that cross section, then that's just, you have been deprived of it. I guess my question is, what happens when your jury, the 12 people who adjudicated your case, are a fair cross section of the community? Then why does it matter that in a hypothetical alternate universe, had one of those jurors been hit by a bus and an alternate would have come on, then you would have maybe had a structural error. Why does it matter? I don't want to repeat myself, but this is not a thing, looking to the hypothetical universe, it's not what the Supreme Court considers under Batson. Right, no, but I'm asking a distinct question about alternate jurors. I don't think the Supreme Court has ever said that error in a Batson challenge to an alternate juror, who in any event would never have been seated, is a structural error. Or did I miss it? Did they say that in a case? They have not said that specific thing, like an alternate juror and a bus being hit. But they have said, this is a thing that affects the entire system. It's also a right of the jurors themselves. The question is, what's the thing? That's the thing is, I thought of the jurors, not whether people waiting in the rings that might become jurors someday. I'm raising a different issue, right? I think the Supreme Court has clearly spoken to the composition of the jury. I'm asking about this notion of what happens when we're talking about somebody who was not and never became a juror. How is that structural error? Do you see what I'm saying? I do not, because in every Batson case, we're talking about somebody who was not a juror. In this case... No, no, no. If you strike somebody in from the veneer who could have become a juror, right? Let's say you have a pool of 100 people. You exercise Batson challenges and you take out everyone from a race and then you do a lottery. Yes. Right? Then we don't know. Maybe those people would have been on the 12, right? But if you do a system where you operate numerically from 1 to 200, and you do your strikes, and maybe there's a Batson challenge to 99 and 100 that's erroneous, but we know because the judge adopted a numerical selection system that 99 and 100 never could have ever made it on the jury anyway. How is there a Batson challenge? I have never seen... I've read a lot of the Supreme Court cases about Batson. I have never seen them make any sort of... They never distinguish between whether somebody is on the veneer, the 12 that are sat, or whether they're an alternate that never would have become a juror. I've never seen them confront the issue. I've never seen them confront that issue either. But everything they've said about how... ...suggested that that's still a valid Batson challenge. I thought it just hasn't come up. Because everything that the Supreme Court has said about how, oh, even striking one, it's a structural error, and it's sort of an offense to the system overall, and it's a structural error not just because of how it affects the defendant, and it would have affected the defendant if this person would have been in a regular jury. But that's not the only thing the Supreme Court has looked to. We've cited the language in our opening brief, and I think also in our reply brief, but I'm not positive, where they say just because somebody... They don't say specifically whether somebody might have been an alternate juror, but they say this kind of discrimination in the selection of jurors, they never distinguish between alternates or regular jurors, is an offense to the entire system. The Supreme Court has never had occasion to look at this. Some other circuits have, I understand. All right, well, that's fine. That wasn't really particularly brief. I just had that question. I know you're over time, but can I ask you briefly, is there any reason to think that the confusion between sociology and geology was pretext for discrimination? Absolutely. And what is that? Every single reason the trial prosecutor gave for saying, this is why I actually wanted this juror removed, turned out to be absolutely false. There's the fact... I thought there were two. I thought there was the confusion about the major or area of study, and then the car gate. No, the prosecutor said, we highlight this in our opening brief, every single person we struck, this is quoting the trial prosecutor, every single person we struck for cause, who either taught sociology or studied it, indicated they could not be objective for that reason. That's absolutely false. There's number 64. We discussed all these in our briefs. There's number 23. These people who supposedly studied or taught sociology, they weren't struck for cause. Why does that indicate that what the government said at 142 is pretext for discrimination? Because it's another thing the prosecutor said in relation to this juror and their supposed reasons for wanting to exclude this juror that was not supported by the record, that was entirely false. In fact, the prosecutor had already been corrected, saying, actually, 23 said that she could be a fair and impartial juror. And so the prosecutor says, we're trying to get rid of number 140. If it's false, underneath that, the whole concept of pretext is that there is some discriminatory motive. Correct. And so I'm not hearing what the evidence is. Well, I've given three reasons. The only three reasons the trial prosecutor gave for this, they're all false. And so three false statements is... Three false statements combined with the fact that this trial prosecutor struck half of the African-American prospective jurors on the veneer, where they made up about 7%. Now, that's mostly relevant to the prima facie issue, but it's also relevant under the third step, like this amazing disparity. Whether that's a coincidence or not, it's another thing to consider. And the trial prosecutor's misstatements with respect to this, he also made misstatements with respect to number 23. So this is part of a pattern. He wants to strike people. He's going to say things about them. Sometimes corrected by defense counsel, sometimes not. Everything he said about number 23 was also false. Said, oh, she refused to give her opinion about cocaine. Defense counsel corrected him about that. That wasn't true. The trial prosecutor also said that number 23 had not even been asked whether she could be fair and impartial. That was absolutely not true. And the trial prosecutor was corrected on that. And yet still, later on, in discussing this Batson issue juror, 142, the trial prosecutor said, you know, everybody who studied or taught sociology said they could not be fair and impartial for that reason. And so we struck them off for cause. Number 64, 23, 60, that's entirely untrue. And then there's the thing about the card game. Saying, oh, we think this person is semi-reclusive. Something you could say about any juror if you wanted to and point to one of their hobbies. Because she plays a card game that necessarily involves other people playing with you, right? It's inherently necessarily social. It's like she's semi-reclusive because she plays basketball. You compare this juror and her hobbies with just about every other juror on that pool, and you could say that they are equally, if not more, possibly semi-reclusive to the extent that she is. I would like to just say, if I can, one sentence. You're out of time. One sentence, I'll hear that. On the sentencing issues. You know, the government is sentencing. The district court accepted the government's claims that Goodluck was a leader of this operation where he was working for cartel operatives that were staying in a house that he supposedly controlled their activities. I think for the reasons we presented in my briefs, that's demonstrably false. So I thank the court. Thanks, counsel. You preserved a minute for a vote. Mr. Grunstein. May it please the court, Benjamin Grunstein on behalf of Appellant Jai Hunter. The district court abused its discretion in this case in refusing to apply a mitigating role adjustment. The court, on the decision on its face, only relied on two out of the five non-exhaustive factors that the guidelines instructs courts to use. And one of those factors, the court plainly misread it and applied the wrong standard. In particular, that factor requires the court to consider, quote, the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts that defendants performed and the responsibility and discretion the defendant had in performing those acts. The court recognized that Mr. Hunter may have lacked the discretion and acted completely at the discretion of defendant Goodlock, but nonetheless said that this factor was met because his conduct was, quote, important. Important is not the relevant standard. In a criminal conspiracy, all conduct is important. The conduct of a mule or a courier is important. And the commission, frankly, in its application note, goes on to say that the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative of whether the defendant should be given an adjustment. So back in 1993 in Shinnewbee, we said it's not the defendant's exact role or status that necessarily decides the question. It's an assessment of the culpability in the context of all the circumstances. And here it looked at the district court considered that Mr. Hunter was a trusted member of the conspiracy and was involved in at least three bulk cocaine deliveries and had contact with Mr. Goodlock on all the key dates and key moments. He was an integral part of a very extensive and large drug conspiracy. Why is, in the face of those findings, is a mitigating role enhancement appropriate? Or... Your Honor, you used one of the words that the court used, which was an integral part. We don't dispute that being the driver or renting a stash house is an important role, is an integral role. Of course, it's a required role for the conspiracy, but that's true of every member of any conspiracy. I actually was not... I'm not sure I used the word integral because I was really focusing on he was a trusted member of the conspiracy, involved in at least three of the large bulk cocaine deliveries. And so we're looking at the assessment of the defendant's culpability in all the circumstances. Right, but let's focus on the word trust because the court did use the word trust. Again, I'm not really sure what that even means in the context of a criminal conspiracy. Anyone that is asked to do anything in a criminal conspiracy is trusted. Well, but not if you go to the big pickup when the guys from the cartel are driving the tractor trailer or something. I mean, there are people that you trust to do little jobs and they're the people that you trust to be your wingman when everything's at stake. I mean, you have to agree, right? It depends on what you're entrusted in doing. Right, but the guidelines correctly talks in terms of discretion. So Mr. Hunter was not trusted to do anything that was not under the nose of his co-conspirator. He was driving. Renting a stash house? He was, right. Who did, was, I don't know, was the kingpin next to him when he went to pay the rent or something? Well, but that's, I mean, it's hard to see how that's a trusted, how going- To get the lease and get the place all set up. That seems like it's a pretty, when people getting, coming along, evicting everybody from the house when you're bagging up the cocaine. Right, but merely signing a lease doesn't seem to rise to the level of the, on the factor that I'm focused on the extensive role that is typically considered. And the example that the guidelines does give is transporting or storing the cocaine or the drugs that that would be considered. That's an example of a minor role is someone who's responsible for storing. So the fact that he signed the lease does seem to fit within that example. If the court has no further questions, I reserve a minute. Thank you. Thank you, counsel. We'll hear from the governor. Good morning. May it please the court, Monica Richards on behalf of the FLE. Starting with the jury issue, I think that your honor, Judge Nardini, you've raised an interesting point. And I did a lot of time researching on that as well as to whether or not the alternate juror difference, I didn't find the case. If that's something the court would like to hear,      No, you have other grounds for why you just say substantively, there was no Batson problem here, you can assume, right? Yes. I mean, I understand that's something I injected here, just more of a matter of curiosity. Thank you. Yes, with regard to the jury selection issue here, the standard of review with regard specifically to the cause challenges is for clear abuse with regard to juror 142, who as we've discussed was an alternate juror, it's clear error. So whether or not the district court by the time we got to the point where he was examining the credibility of the prosecutor's statements with regard to that factual accuracy here has been in question, but that aims at the wrong target. What we're talking about is the genuineness of the motive. So if the prosecutor here understood that that was the way that the jurors spoke and the district court had the opportunity to be there and observe and made a, I'm sorry. Your colleague points to a number of statements that he said are belied. Their accuracy is belied by the record just on the face of it. So this is not a matter of judging credibility based on demeanor. There are factual statements that suggest that there was a pattern of striking jurors based on demonstrably false presented rationales. And I'd appreciate hearing more about those in particular, about the sociology statement, about the reclusiveness statement and so on. Could you address those in specific? The easiest one for me I'll start with is the sociology versus geology issue. I mean, that was a mistake that was obvious now based on the record looking back. Well, but in terms of what he was saying was that in fact other people, setting aside the sociology, geology confusion, that other people who had given their backgrounds as sociologists had not been struck. And the prosecutor had said that he had a pattern of striking them all. That was his preference as I understood it. I mean, maybe I misunderstood. No, I mean, they had been struck. I mean, the jurors who were identified, Juror 64, there was a peremptory used on. That was one of the jurors. There was one juror who is noted in the record who the prosecutor did not strike, who indicated they were a geology major. But we have no idea if the prosecutor knew that that person was a geology major. Or I'm sorry, I just did it. It was a sociology major, excuse me. We have no idea if the prosecutor knew or didn't know or caught it that that person said sociology. So I don't think that that's a fair argument to make here. So you think the record just doesn't support that statement that he was principled one way or the other in striking all people with a sociology background? Right, most clearly is the one who he specifically identified was Juror 64 against whom he'd used a peremptory. And then we obviously here do have the jurors who the court removed for cause. Even though they said that one was a sociology professor, in fact, was the professor of Juror number 64, which was a weird coincidence. And then Juror 123, also same thing, said I believe drugs should be legalized. The selling of drugs should be legalized. And the district court found those not to be credible statements. The district court removed them for cause. So is there wiggle room in the way that we read that literally in terms of what the prosecutor said? Absolutely. But the judge who was in charge of the case and who watched and who heard and the whole totality of the circumstances makes a very specific finding that the defendants who bear the burden here had not met their burden of demonstrating an impermissible discriminatory purpose in issuing and using those strikes. So I, excuse me, the peremptory challenges. In particular, it's on page 107 of the government's confidential appendix. In particular, the analysis of and congruence with other strikes of other folks who had similar issues and similar fields of study, including related to sociology. That's it. So the judge looked at that and understood what the prosecutor was saying and made the finding that the prosecutor's setting aside any factual accuracy that we now know to be an issue, the genuineness of that motive. And that's what this court's reviewing here. And again, that standard review is very specific. It's for clear error. Did the district court clearly err in making that finding regarding the prosecutor's genuineness of motive? Thank you. Thank you. With regard to the sentencing issues, I'm sorry, I'll start with Mr. Davis and the sufficiency of the evidence here on counts one and two. Here we did have more, excuse me, than what was this trip to Cleveland and bringing the cocaine-filled tire back. We had the two folks who cooperated here talking about how Davis was in and out of that apartment. He cocained himself in that apartment. He brought money into that apartment. He was taught how to wrap money. You're saying if the jury was entitled to credit the cooperators and that answers the sufficiency question? Yes. I mean, that would dispose of it. We wouldn't have to really go any further because that's up to the jury to decide who do they believe and who do they disbelieve. Correct. Thank you. Could you address the stash house? Because I am struck by the difference in wording in the guidelines with the stash house enhancement specifying if the defendant maintained a premises for the purpose of marketing or distributing a controlled substance increased by two. And it seemed to me that that specificity, there's a good argument that that specificity means that you have to look for the defendant's own conduct. And that wouldn't exclude a co-conspirator or more than one defendant from maintaining the stash house and warranting the enhancement. But here the district court seemed to be importing just the co-conspirators actions without finding actions by, I guess, Mr. Davis in particular himself, I guess, Mr. Goodluck, but Mr. Davis in particular using the other relevant conduct, the other conduct of other defendants. So could you give us your view, please, of why we shouldn't take that very literally? My concern being that if you always will take in a conspiracy setting, take the maintaining the stash house of any co-conspirator, that this is a very, very broad application that would apply or enhancement that would apply kind of across the board. I appreciate the question, Your Honor. I would point Your Honor out a couple of ways here, but 1B1.3 is the other sentencing guideline. And that is the thing that requires jointly undertaking criminal activity to be taken in consideration. And there are very specific to address the court's concern. It wouldn't just be every co-conspirator. It would only be as structured in 1B1.3, those within the scope of the jointly undertaking activity in furtherance of the activity and importantly, reasonably foreseeable in connection. But why isn't that, whenever there is a large drug conspiracy, they're going to need someplace to stow the stuff. Why doesn't that make automatically every co-conspirator liable for maintaining a stash house if there is a stash house? But why wouldn't it? I mean, why isn't that okay? On the flip side, respectfully. Because the guideline says if the defendant maintained a stash house. So if you have someone who doesn't have a key, has no access, no controls, who visits once during the course of an extensive conspiracy, didn't sign the lease, has no maintaining himself. There's nothing that he did to maintain. He used it once. Why should that warrant the enhancement? I would say that that's a closer question, Your Honor. If that's the scenario, but that's not the scenario. I appreciate, again, the court's question with regard to that. But that's why we read these two things in conjunction. Can I just ask if on that, sort of following up on Judge Carney's point, with 846 conspiracies, often I've seen that we have indictments that will charge, say, 20 people as part of a single 846 conspiracy. But then each one is broken down with specificity within the indictment. With respect to their liability under, say, 841B1A, B1B, B1C, depending on the nature of the drug and the quantity of the drug, right? So just being convicted of the 846 conspiracy alone does not determine, well, was the heroin part of your part of the conspiracy? Did you agree to the heroin part? Or even if you did agree to the heroin part, did you agree that it would be however many kilos? So when we have all those distinctions in there, we don't say that you automatically have liability because you're a conspirator. Everything the conspiracy did is necessarily reasonably foreseeable to you or part of your agreement. Is that effectively what we're saying? Something's analogous here, 1B1.3, that it's not in for a penny, in for a pound. Once you're a conspirator, automatically, if one defendant has a stash house, you're necessarily tagged with that, right? Agreed, yes. Can I ask you, though, what do you make of your opponent's argument that B7 of 2D1.1 actually has this clause of a defendant, comma, or a defendant for whose conduct the defendant is accountable under 1B1.3 relevant conduct did a certain thing? I'm going to run out of time before I answer. Can I answer? Okay, I'm not done yet. Okay, but I think that goes to Judge Park's initial question of my colleague, which was, what about a conspirator? Like, do we expect the sentencing guideline in every one of these to say if the defendant or a conspirator and then loop back in everything that we have from 1B1.3 was foreseeable? So my point is, does this become surplusage? What work does the clause I've just cited in 7 do? Is it an artifact of drafting? Because I think the import of your argument is, since 1B1.3 is of necessity applicable to every enhancement, why would you put it here? Well, because I think it actually broadens it, Your Honor, in the case where we don't have co-conspirators, right? I think in that, I don't know for sure. I really don't. But I could read this the other way. I could say here, we're specifically trying to loop in. Well, you don't need co-conspirators, right? I mean, it's just anybody. Does 1B1.3 only apply to co-conspirators? No, but that's what I'm saying is that this is really trying, like, this is trying to loop in more. This is trying to be more inclusive, right, than just the normal co-conspirator. No, but I'm just cross-referencing 1B1.3. That's true, it does. I can't, I really can't explain why it's in 1B. But I can, I'm sorry. Well, I think the difficulty then for your opponent is that we have Lewis, where we looked at 3B1.4 that had identical language to B12. If a defendant did a certain thing, then you have reasonable, I'm sorry, then you have the relevant conduct layer on top of it. So, but I am puzzled as to why that language is in 7, unless in 7, as you say, they're trying to expand it by saying if a person for whose conduct the defendant is accountable distributed, and somehow you're looking only at the identity of the person who would be tagged with the B7 enhancement and not other requirements of 1B1.3, like reasonable foreseeability or something. Like, you're just saying automatically if a type of person did this thing, we're not then looking towards whether, I don't know, all those sort of conduct-specific links also exist, but just the person-specific links. It's not the first time that I've tried to understand why some of these, some language is in these guidelines and some's not. But I... Do we have to interpret this at all? Or here, do you have enough evidence of these defendants maintaining? Well, thank you, that's a good point. Here, this court can affirm on any basis in the record, and here I was gonna note the fact, thank you, that this isn't somebody who was just there to pick up a one-time deal. I mean, this is somebody who brought in the cash. I mean, talk about maintaining, as is described in the notes to this, the application notes. I mean, he brought in the money that paid for the apartment, presumably, when he was bringing back in the cash. He was bundling the cash that was being sent to pay for the cocaine that was fronted. So here we have somebody who wasn't just doing hand-to-hand transactions. I mean, we had somebody who was responsible for hundreds of thousands of dollars, tens of kilograms of cocaine. He's not... So in terms of maintaining, there's no requirement that just the person who signed the lease or just the person who had the key, it can be multiple people. Is there anything indicating in the record that the funds from the sales of the drugs were used for rent for this stash house? Specifically, no. No, but it's in there as a concept. I mean, I'm just saying in terms of maintain, we have a hard time defining that. And maintain can mean all sorts of things. For Davidson, good luck maintaining the stash house. He came and went freely. He cooked cocaine there. He cooked a crack in the... I'm sorry, cocaine powder in a crack there, at least on two occasions. We had two of the cooperators testify to that. He was somebody who was responsible for going to that apartment to evacuate Mr. Pavia when there was a bus that went bad, when the tractor trailer that was later the second delivery in October went bad. He went there and picked up Mr. Pavia. He knew where to go. He knew that the place was there. He... I really think just cooking powder into crack is enough. The district court itself did not make a finding on that basis, right? He said that he applies the stash house enhancement not because Mr. Davis personally maintained premises to manufacture and distribute controlled substances, but because maintenance of the Clinton Street apartment is jointly undertaken activity under 1B13. Yes, that's true. I was answering Judge Park's question. I just want to clarify that that wasn't the basis for the district courts. No, the district court, right, looked at those cases from the Sixth Circuit and the Eleventh Circuit and found that those were consistent with rulings in this court, namely Lewis, and also we haven't discussed McCrimmon, but McCrimmon is one where the statute says the other way. It says under reckless endangerment, it says it's limited to the defendant's conduct himself. That 3C1.2 says it's limited to the defendant's conduct himself. So that wouldn't be one where I'd be standing in front of the court and suggesting that he was liable under the jointly undertaken activity provision. So you're saying basically though that his own activities warranted the application of the maintenance finding and enhancement? Additionally, yes. There's no further questions? No, I'll rest on my brief then. Thank you, Your Honors. Thank you, Counsel. We'll hear about us. I know I have a limited amount of time, so I would just like to get back to Your Honors' concern about the overuse of this enhancement if this is allowed to go forward. This is something that the probation officer put into the probation report about the concern. Let me ask though before you get to the policy question, we've just heard a recitation of Mr. Davis' own actions with respect to the property here. And I wonder what you would point out is missing that wouldn't have allowed the district court to apply the enhancement just on the basis purely of Mr. Davis' own actions. Well, I think it would have to be based on pure speculation that the government suggests that the money, and I'm not sure if he was talking about Goodluck or Mr. Davis, that the money that was brought to the apartment was used to pay the rent at the apartment or that Mr. Davis had any kind of control over the apartment to the extent that he would be said to have maintained this apartment. Well, if he used it to store drugs and cash proceeds, he went to, as a depot, pick up additional cocaine to sell and drop off the proceeds to package the cash, and he himself cooked powdered cocaine. So he was an active user of the property. Did he have to sign the lease in order to be the one who maintained the property? No, you don't have to sign a lease, but you do have to maintain some kind of control over the property and just going there a few times. And there are some discrepancies in the testimony of the two cooperators about how often he was there and whether or not he was there on that initial day when the 10 kilos were removed from the tire. There are some discrepancies in that cooperator testimony. And I suppose you would say he didn't have a key, he didn't control who went in and out? There is no evidence that he did or that he controlled who went in and out. There simply isn't enough. And as Your Honor pointed out, the district court did take note that really this was being done on a conspiracy level. The imposition of this enhancement really was based on the conspiracy. But I think it's important also for the court to take note of the fact that the probation department had this in there, the enhancement, and then they removed it after they spoke with a representative of the Sentencing Commission, who must have told them, yeah, no, this isn't. I mean, as much as we value the views of probation officers and as much as we value the work that is done by staff members at the Sentencing Commission, these are decisions for judges. So we don't really owe deference to people who may or may not have had phone calls, right? I mean, I understand that, but there are a couple of cases that I did cite in my brief where it says that the court should follow what the Sentencing Commission- I don't think we say we should follow what a probation officer may or may not have talked about over the phone informally with somebody who happened to pick up the phone with the Sentencing Commission. That would seem to be a bit much, right? I totally agree with that if it's some random person answering the phone, but we don't have a lot of information about- Well, if we have it the other way around, if we have a case where the probation officer says, well, I talked to somebody at the Sentencing Commission on the phone, and they said they were the person who drafted this thing, and they said that this enhancement stays in, would you really be making the same argument? No. No, I wouldn't. And that's why I think it all goes back to the text of the enhancement. And as the government encourages the court to consider- or not to consider the fact that this would be overbroad because it would limit it to certain people, the list that the government just provided really would be anybody involved in the conspiracy. As we know, conspiracies obviously have very broad application. And as you said, where do we cut it off? I mean, there's no evidence that he had any- maintained any control over this apartment. So really, we're just saying, then, that anybody who's involved in the conspiracy because- No, no, the guy who sends the tractor trailer up from Laredo is not going to be tagged with this. But a guy who does go in every other day, and a guy who is cooking cocaine into crack, there, there's a distinction. There's a principal distinction. I don't think we're saying that if the latter case is going to get tagged with this enhancement, that the guy who happens to be in Laredo, who just is sending up the shipment, is going to be tagged. I don't think that necessarily follows one from the other. But if we are saying that it's available to anybody to whom this is reasonably foreseeable, that there could be an apartment held there, or an apartment somewhere, even if he never went to the apartment, what is stopping the government from imposing it? If we're going to say that it's reasonably foreseeable to anybody involved in the conspiracy that there could be an apartment, what if somebody drops off the drugs in front of the apartment? So they know the apartment is there. Does that make them responsible for the maintenance of the stash house? Okay, counsel. Thank you. Thank you, your honors. Mr. Anderson. Thank you, your honors. The government says that in Batson, we look to the genuineness of the motive. Under the third step, the Supreme Court has said you look to the persuasiveness or the credibility of the motive, of those statements that are given, the reasons that are given. When they're all false, as they are in this case, it's hard to say that they're credible or persuasive. As to the cause challenges, I didn't hear the government say, or they didn't write in their brief, that it's permissible to strike prospective jurors for cause and say that they're biased and that they were wrong in saying that they could try the case fairly just because they have widely held, generalized views about drug laws in the United States. They weren't even asked to distinguish between federal and state drug laws, by the way. As for the stash house enhancement, what's required is proof of whether Goodlock or Davis could have controlled access to the activities or what happened, could have controlled access to or the activities that happen in the apartment. So if either of them could have said to these drug cartel operatives who flew up to oversee their activities and brought a gun with them, the record reflects, actually, I'm not gonna let you stay in this house anymore or I'm gonna control your activities and give you orders in this apartment anymore. That's what maintaining requires. There's very little case law from this circuit on the maintaining element. Do you think maintaining requires control? Like there's one person who has the key, that person maintains. Everyone else who uses it every day, bundles, packs, and cooks and does all these different activities there on a regular basis, stores there, cash proceeds and other things, that doesn't maintain. I think it doesn't necessarily have to do with the key. If my drug lord boss comes into town and I check into a hotel and beep him into his apartment, give him the key, and then I come and visit him to take his drugs, sell them for him, and bring him back the money, no matter how many times I do it, am I controlling his access to that premises or am I in charge of what goes on in those premises? I'm just noting the difference, the possible difference between the word control that you emphasize and the word maintain, which is, I think, broader and a little less specific. And that's the word that's used in the sentencing guidelines. Well, I believe what this court used in the Esteris case and in prior cases regarding the maintaining element, it has to do with controlling access to or the activities within the premises. Finally, I just want to quote from one Supreme Court opinion with respect to Judge Nardini, our conversation before. The Supreme Court said that racial discrimination in the selection of jurors casts doubt on the integrity of the judicial process and places the fairness of a criminal proceeding in doubt. I don't think from there, there's much room to argue that, yeah, but if somebody would have been an alternate juror and they were discriminated against and not led on that, and now we know at the end of trial that alternate jurors weren't set, no harm, no foul. If there are any further questions from the court, I'm happy to entertain them. Thank you, counsel.  Thank you all. Thank you for your service and we'll take the case under advisement.